# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**In re Juan M., 2012 IL App (1st) 113096**

---

| | |
|---|---|
| Appellate Court Caption | *In re* JUAN M. and KIHARA M., Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Juan Carlos M., Respondent-Appellant). |
| District & No. | First District, First Division<br>Docket Nos. 1-11-3096, 1-11-3192 cons. |
| Filed | April 23, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the placement of respondents' children under the guardianship of the Department of Children and Family Services pursuant to a dispositional hearing that resulted in a finding that respondents were unable to care for their children who had been adjudicated abused and neglected, the appellate court, as to respondent mother, granted the public defender's *Finley* motion to withdraw and affirmed on that basis, and as to respondent father, the court affirmed the trial court's adjudicary and dispositional orders on the basis that the court's findings were not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 11-JA-183, 11-JA-184; the Hon. Griffin Maxwell, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal        Elizabeth Butler, of Northbrook, for appellant.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), guardian *ad litem*.

Panel        JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Presiding Justice Hoffman and Justice Karnezis concurred in the judgment and opinion.

## OPINION

¶ 1     On September 30, 2011, the trial court found nine-month old Juan M. to be: (1) physically abused; (2) abused due to a substantial risk of physical injury; and (3) neglected due to an injurious environment, pursuant to the Juvenile Court Act of 1987 (hereinafter, the Act) (705 ILCS 405/2-3(2)(i), (2)(ii), (1)(b) (West 2010)). The court also found Juan's older sister, 28-month-old Kihara M., to be neglected due to an injurious environment. After making these adjudicatory findings, the trial court held a dispositional hearing and found both parents (hereinafter, Mr. and Mrs. M.) unable to care for Juan and Kihara. Juan and Kihara were made wards of the court and placed under Illinois Department of Children and Family Services (hereinafter, DCFS) guardianship. Both parents timely appealed the trial court's adjudicatory and dispositional orders. This court consolidated both appeals on November 17, 2011 (No. 1-11-3096 (Mr. M.) and No. 1-11-3192 (Mrs. M.)). On December 29, 2011, Mrs. M.'s attorney, the public defender of Cook County, filed a motion to withdraw as counsel on appeal pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). We took the *Finley* motion with the case. On Mr. M.'s appeal, we affirm the trial court's adjudicatory and dispositional orders on the basis that the trial court's findings were not against the manifest weight of the evidence. On Mrs. M.'s appeal, we grant the *Finley* motion and affirm on that basis.

¶ 2     Mr. and Mrs. M. are married and are the biological parents of Juan, born on December 13, 2010, and Kihara, born on May 11, 2009. Juan and Kihara came to the attention of DCFS on March 11, 2011, when Mr. and Mrs. M. took Juan to the emergency room at Westlake Community Hospital (hereinafter, Westlake) after Juan had trouble feeding and then became unresponsive. Upon transfer to Loyola University Medical Center (hereinafter, Loyola), he was diagnosed with two skull fractures and had bruising on his face. When Mr. and Mrs. M. could not explain his injuries, a hotline call was placed to DCFS, and a child-abuse and neglect investigation ensued.

¶ 3     On March 24, 2011, the State filed motions for temporary custody and petitions for

adjudication of wardship for both Juan and Kihara. The State's adjudication petition alleged that on March 11, 2011, Juan was diagnosed with a skull fracture and had two bruises on his face. Mr. and Mrs. M. had no explanation for the injuries. Because of Juan's age and lack of mobility, and the seriousness of his injuries, medical personnel were concerned "that there is no explanation as to how he was injured." The adjudication petitions for both Juan and Kihara alleged abuse due to substantial risk of physical injury, and neglect due to an injurious environment. On March 24, 2011, the trial court placed both children in DCFS temporary custody.

¶ 4    On May 4, 2011, the State moved to amend the adjudication petitions and requested the following sentence be added: "Medical personnel state that [Juan's] injuries are consistent with injuries suffered by non-accidental means." The State requested a count of physical abuse for Juan. The trial court allowed the amendment to the petitions.

¶ 5    Doctor Maria Conchita Tuason was called as a witness at the adjudicatory hearing. Doctor Tuason was the primary care physician for Juan from his birth to DCFS involvement. Juan was born premature at 35 weeks. At birth he weighed 5.6 pounds and suffered from respiratory distress and hyperbilirubinemia (jaundice), which resolved soon after his birth. He was released from the hospital on December 24, 2010. On December 28, 2010, Mrs. M. brought Juan to Doctor Tuason's office for a follow-up examination. Doctor Tuason noted Juan was doing well. On January 6, 2011, Mrs. M. again brought Juan to Doctor Tuason's office for a physical examination. Doctor Tuason had no concerns about Juan's well-being at that time.

¶ 6    On January 13, 2010, Mrs. M. brought Juan to Doctor Tuason because he had a cold. Doctor Tuason noted Juan had some nasal congestion with mucus, "but nothing more significant than that." Juan weighed 7 pounds, 10 ounces on that visit. On March 7, 2011, Mrs. M. brought Juan to Doctor Tuason for his scheduled vaccines. At that visit, Juan weighed 13 pounds. Doctor Tuason noted he had "some mark on the bitemporal area. It [was] blackish in color." Doctor Tuason also testified Juan had a bracelet on his arm and was concerned that it presented a choking hazard.

¶ 7    During all of Juan's visits with Doctor Tuason, Kihara was present. Doctor Tuason described Kihara as a "regular one-and-a-half-year-old child, very interested in a lot of things." Doctor Tuason told Mrs. M. to closely supervise Kihara when she was around Juan because Kihara was very active and "pulling a lot of things from anywhere." Doctor Tuason had no other concerns about Juan.

¶ 8    The assistant State's Attorney showed Doctor Tuason the bracelet that Juan wore, and Doctor Tuason agreed it was "roughly three to four inches in circumference with *** small beads around that circumference." There was another larger bead attached to the bracelet. On cross-examination by the assistant public guardian, Doctor Tuason testified she saw Juan, prior to his head injuries, on December 28, 2010, January 6 and 13, 2011, and March 7, 2011. Doctor Tuason never saw Juan's head injuries when he was at Loyola.

¶ 9    The trial court asked Doctor Tuason about her testimony that she noticed a black discoloration on Juan's temple on March 7, 2011. She assessed that mark and testified there was not any surrounding swelling, so she did not think the mark was due to trauma.

¶ 10    Moises Cruz, the DCFS worker who investigated the abuse allegations, testified his investigation began on March 11, 2011, when DCFS received a hotline report that Mr. and Mrs. M. had brought Juan to the hospital with a "bump on the head, old bruises on the left side of the face." Mr. Cruz went to Mr. and Mrs. M.'s home on March 11, 2011, and first spoke with Mr. M. alone. Mr. M. told Mr. Cruz that at about 12:30 a.m. on March 11, 2011, he lifted Juan from a swing-chair to give him some milk, and he noticed that milk was coming out of Juan's nose. Mr. M. passed Juan to the mother, and at that point Juan became unresponsive. They took him to the hospital.

¶ 11    Mr. Cruz also spoke alone with Mrs. M., who said she would never harm Juan and that she had no explanation for his injuries. Neither parent gave any explanation for Juan's injuries.

¶ 12    After Mr. Cruz spoke with the parents separately, he spoke with them together, along with the children's grandparents, who also lived in the home. Mr. Cruz explained the nature of Juan's injuries, the abuse allegations, and that Kihara would not be able to remain in the home. Kihara was placed in DCFS protective custody that day, and Juan was put in protective custody when he was released from the hospital on March 22, 2011.

¶ 13    Doctor Mary Jones testified she is a general pediatrician and child-abuse specialist at Loyola and had worked there for the last seven months. The trial court admitted Doctor Jones's *curriculum vitae*. Doctor Jones graduated from the University of Illinois Medical School in 1997 and did her residency in general pediatrics at Advocate Christ Hospital from 1997 to 2000. She is licensed to practice medicine in Illinois and board certified in pediatrics. Doctor Jones is an assistant professor of pediatrics at Loyola and is the physician representative of the child advocacy team at Loyola, where she is responsible for all child-abuse and neglect consultations. She is a fellow at the American Academy of Pediatrics, and a member of the child-abuse and neglect section there. From October 2009 to February 2011, Doctor Jones worked for Aunt Martha's Youth Services and Healthcare, coordinating medical care for DCFS-involved children, and evaluating children for abuse and neglect. From 2007 to 2009, she worked as a pediatrician at Children's Hospital in Wisconsin. From 2004 to 2007, she worked for Advocate Christ Medical Center in Oak Lawn, supervising residents and coordinating care for medically complex children.

¶ 14    Doctor Jones testified that in her current position as a child-abuse specialist and co-director of the child advocacy team at Loyola, her job is to evaluate children who are suspected victims of abuse and neglect. Over the course of her career, she has consulted on thousands of pediatric cases and on over 100 cases involving suspected abuse or neglect. Doctor Jones has testified 5 to 10 times in court and previously has been qualified as an expert in pediatrics and child-abuse pediatrics.

¶ 15    On *voir dire* by Mr. M., Doctor Jones could not quantify the number of cases she had consulted on involving only neglect or involving skull fractures, but a month before, she consulted on a case involving a skull fracture and suspected child abuse. Doctor Jones did not know if she has ever been qualified as an expert on "child abuse pediatrics involving skull fractures." On inquiry from the court, she testified she would be eligible in 2013 to take the board exams for certification in the subspecialty of child-abuse pediatrics.

¶ 16    Over Mr. M.'s objection, the trial court admitted Doctor Jones as an expert in pediatrics and child-abuse pediatrics.

¶ 17    Doctor Jones testified that on March 11, 2011, she was called for a consult from the pediatrics team when Juan presented with injuries that were "concerning for non-accidental trauma." She examined three-month-old Juan and noted he had a swollen scalp on the left side and a two-centimeter bruise on his left cheek. The trial court admitted photographs of Juan's face, taken by Doctor Jones, when she examined him. Doctor Jones testified the photographs showed a bruise on Juan's cheek, underneath his left eye, but did not show the swelling on his scalp, due to his dark hair. Juan's soft-tissue swelling on his scalp was caused by trauma.

¶ 18    Doctor Jones reviewed Juan's CT scan from Westlake, taken before he was transferred to Loyola, which showed Juan had a left-parietal skull fracture and an occipital fracture with a small depression. The parietal bone covers the top and the upper half of the skull.

¶ 19    Doctor Jones testified that skull fractures are always caused by trauma, and two types of force can cause a fracture. One type is static force, which is compression that can happen over a period of time, such as when an infant's skull is compressed in the birth canal during birth. The second type of force is dynamic, where, typically, the head is stationary and something hits the head, or the head is moving and hits a stationary object. There was no way to tell whether Juan's skull fractures were caused by static or dynamic force.

¶ 20    Doctor Jones testified Juan's skull fractures would have required a considerable amount of force, because an infant's skull is thinner than an adult skull, and the bones are separated by sutures, which allow an infant's skull to grow. Skull fractures in adults require less force. A "significant amount of pressure" is required to fracture an infant's skull. Juan was not ambulatory at the time of his fractures and was not capable of inflicting the skull fractures on himself because he did not have the developmental capability.

¶ 21    Doctor Jones described the occipital fracture she found on Juan. The occipital bone is the bone in the back of the skull. Doctor Jones noted a slight depression in the fracture, which is usually caused by the skull being hit with "something that has a smaller surface area than something like a floor or a table. For example, it could be a corner of a table, could be a shoe, something with a smaller surface area." The occipital skull fracture would have been caused only by trauma, and the occipital bone had the same malleable characteristic as the parietal bone in terms of the significant force needed to cause the fracture. Doctor Jones was not able to date the fractures.

¶ 22    Doctor Jones spoke with Mr. M. on the phone on March 11, 2011, with the assistance of an interpreter. Mr. M. told Doctor Jones that around midnight on March 10, 2011, he noticed milk coming from Juan's nose and he seemed to be choking. Mr. M. turned Juan over on his stomach and patted his back. When he turned Juan back over, Mr. M. noticed he was listless and was not crying. Mr. and Mrs. M then took Juan to the emergency room.

¶ 23    Doctor Jones asked Mr. M. about Juan's status earlier in the day, and he told her that around 3 p.m. or 4 p.m. that afternoon, Juan was not "acting like himself." Juan was crying and fussy, seemed to be in pain, and looked "blue and purple." Juan fell asleep in the afternoon, and Mr. M. did not seek medical attention for him at that time. Doctor Jones

attempted to gather more history from Mr. M. regarding how Juan seemed after 4 p.m., but the phone connection was lost and could not be reestablished.

¶ 24 Doctor Jones spoke with Mrs. M. in person on March 21, 2011. She described the events of March 11, 2011, the same way Mr. M. did. However, Mrs. M. told Doctor Jones that when she entered the room where Mr. M. and Juan were, she felt Juan's head and asked if Mr. M. had hit Juan, and Mr. M. said no. Mrs. M. said she was Juan's primary caregiver. Mrs. M. brought in a bracelet that she put on Juan's arm, which had beads on it with a small, hollow, wooden ball on the end. Mrs. M. believed Juan could have hit himself with the bracelet while wearing it, which she thought might have caused the bruise, but Doctor Jones did not believe Juan had the motor skills to self-inflict that kind of injury. Mrs. M. also said she had been kissing Juan on the cheek in the car on the way to the emergency room on March 11, 2011, and wondered if that could have been the cause of the facial bruise, but Doctor Jones did not believe that was possible.

¶ 25 Doctor Jones opined, to a reasonable degree of medical certainty, that Juan's injuries were caused by nonaccidental trauma. Doctor Jones based her opinion on the medical evidence and the lack of any explanation for Juan's injuries.

¶ 26 On cross-examination by the assistant public guardian, Doctor Jones testified she could not determine whether the two different skull fractures were caused by the same or separate traumas, because she could not determine the age of the fractures and because she did not have a history of how they occurred.

¶ 27 Doctor Jones reviewed a skeletal survey of Juan and saw nothing indicating he was more susceptible to fractures due to his premature birth. Juan's injuries were caused by inflicted trauma.

¶ 28 On cross-examination by Mr. M., Doctor Jones testified Juan had not had previous visits to the hospital for suspected abuse, and the bone survey done on him ruled out other trauma to the body. There were no other bruises on Juan. Juan also appeared to be of appropriate weight.

¶ 29 Doctor Jones testified there is no reliable way to date an infant's skull fracture and no reliable way to accurately determine the amount of force needed to cause a skull fracture in a three-month-old infant. A skull fracture, by itself, in an infant, is not necessarily child abuse, and it is possible that a fracture can be accidental, but Doctor Jones did not receive that history from the parents. A three-month-old infant may appear "mainly fussy" after receiving a skull fracture, and it is not abnormal for an infant that age to act fussy from time to time.

¶ 30 In terms of Juan's bruising, Doctor Jones testified a bruise develops after sufficient force to disrupt the blood vessels and the blood leaks from the vessel into the tissue. A bruise may not become apparent for hours or days after the injury, depending on the depth of the vessels that were disrupted. There is no method to date the bruise.

¶ 31 During her investigation, Doctor Jones telephoned Juan's pediatrician, Doctor Tuason. She told Doctor Jones, "at one point," Juan had a bruise on his right cheek, which Doctor Tuason attributed to Kihara. Doctor Jones did not rule out Kihara could have caused the bruise under Juan's left eye because she did not get any history of any cause for the bruise.

¶ 32     Doctor Jones testified that one factor contributing to her opinion that Juan's injuries were nonaccidental was the lack of history given by the parents. Doctor Jones determined the parents were not credible when they were unable to provide an explanation of Juan's injuries.

¶ 33     On cross-examination by Mrs. M., Doctor Jones testified she could not determine whether Juan's fractures were caused by dynamic or static force. However, it was not possible Juan's fractures were caused when he went through the birth canal, because his soft-tissue swelling over his left-parietal skull fracture indicated an acute injury, not one that occurred 2½ months ago. Doctor Jones testified Juan's bruise under his left eye was two centimeters in diameter, and the bracelet Mrs. M. showed her measured two centimeters at the end.

¶ 34     On redirect examination by the State, Doctor Jones testified there was no soft-tissue swelling over Juan's occipital fracture. Doctor Jones agreed that the parents' inability to give a cause for Juan's fractures was incredible because "this is a three-month-old child who one would reasonably expect to be cared for in such a way as to not be placed in circumstances that could cause skeletal fractures," as well as facial bruising. On re-cross-examination, Doctor Jones testified it was uncommon for the parents not to know the cause of a skull fracture in their three-month-old infant. Doctor Jones testified, upon inquiry from the court, that the typical mechanism for an infant-skull fracture was when the parent dropped the infant or the infant rolled off a table onto a hard floor. While she could not state specifically how much force would be needed to cause a skull fracture in a three-month-old infant, it would have to be a "considerable amount of force," due to the malleability of the skull. A child will not get a skull fracture from being "tapped on the skull." An infant Juan's age could not generate the force to cause such an injury to himself.

¶ 35     The trial court admitted People's exhibit 4, Juan's certified and delegated birth records from St. Mary and St. Elizabeth Medical Center. The trial court also admitted People's exhibit 5, certified and delegated medical records relating to Juan from his regular pediatrician, Doctor Tuason. The trial court admitted People's exhibit 6, Juan's certified and delegated Loyola records.

¶ 36     The State published from People's exhibit 6. The State's publication referred to the assessment portion of Juan's medical records, which states he presented with multiple skull fractures and multiple bruises on his face. There was a bruise on the tip of his nose and under his left cheek. The report states Juan's injuries were nonaccidental because there was no history of trauma or bone disease, and "an inconsistent accounting of the time surrounding the injury being detected by the caregivers and the presence of facial bruising on an infant without the developmental capacity to self-inflict, are consistent with non-accidental injury." The State also published from the neurosurgery consult a section stating Juan reportedly became "unusually fussy at approx 12:30 a.m." and "Head CT there showed large, minimally displaced left parietal bone fx with trace of underlying SDH as well as evidence of older skull fractures. Parents denied any recent trauma or falls."

¶ 37     The trial court admitted People's exhibit 7, which were Juan's certified and delegated medical records from Westlake. Juan was taken to Westlake prior to being transported to Loyola, and the Westlake records indicate Juan presented there with multiple skull fractures

and suspected abuse.

¶ 38    At the close of the hearing, the trial court found Juan was physically abused, abused due to a substantial risk of physical injury, and neglected due to an injurious environment. The trial court found Juan's neglect was inflicted by both parents, but did not make a finding that the abuse was inflicted by both parents or either parent. The court found Kihara neglected due to an injurious environment. Kihara's neglect was inflicted by both parents.

¶ 39    The trial court immediately began the dispositional hearing. Anna Maria Aldana, the Catholic Charities caseworker assigned to the case, testified both children had been placed in a nonrelative bilingual foster home. Ms. Aldana testified Kihara was two years old and was receiving weekly speech therapy, as well as therapy for her motor skills. She was due to start weekly play therapy the following week at Catholic Charities. Juan was nine months old, and Ms. Aldana did not know whether he had been evaluated for developmental problems. Catholic Charities had received reports from a doctor which stated Juan had no ongoing medical concerns relating to his previous head injuries. The foster home was safe and appropriate, and the foster parents had no other children and spoke Spanish.

¶ 40    Both parents had been assessed for services, and both needed parenting classes, parenting coaching, and individual therapy. They had begun parenting classes and coaching at Catholic Charities. The coach who conducted the classes was very pleased with both parents' cooperation. They had not missed any classes and were implementing what they had learned. Individual therapy had not yet begun, because the agency only had two Spanish-speaking counselors.

¶ 41    The parents had supervised visits together twice a week, and they interacted with the children appropriately. Ms. Aldana recommended the children be made wards of the court and placed into DCFS guardianship, due to the ongoing service needs of the parents.

¶ 42    The trial court admitted the May 23, 2011, DCFS integrated assessment for the family. The assessment reports Mr. M. expressed love and concern for the children, was confused about DCFS involvement, and was sad the children were taken out of his custody. He denied that he, his wife, or parents caused Juan's injuries, and he was willing to participate in services and cooperate with DCFS to regain custody of the children. The assessment noted Mr. M. exhibited some parenting strengths, but he displayed a weakness by not being able or willing to ensure Juan's safety.

¶ 43    The assessment reports Mrs. M., also, was confused and sad about the family's DCFS involvement. She wondered if Juan's injuries were caused by the hospital or the DCFS investigator, which was "concerning as blaming others helps reinforce her denial of guilt." She was willing to participate in services to achieve reunification.

¶ 44    The assessment reports Juan was developing age appropriately. Kihara had some developmental and behavioral concerns with her communication skills, fine motor skills, and problem solving. She was not eating well, was aggressive, and had a high activity level.

¶ 45    When the parties made their closing arguments, the State and the public guardian requested the children be made wards of the court, that the parents be found unable to care for them, and DCFS guardianship administrator, D. Jean Ortega Piron, be appointed the children's guardian. Mr. M.'s attorney stated: "I concur with the State and the guardian." The

trial court entered a dispositional order with the findings requested by the parties.

¶ 46    Both parents timely appealed the court's adjudicatory and dispositional orders. We consolidated the appeals.

¶ 47                        I. Mr. M.'s Appeal (No. 1-11-3096)

¶ 48    Mr. M. argues the trial court erred in finding Juan was physically abused, abused due to a substantial risk of physical injury, and neglected due to an injurious environment, pursuant to the Act. 705 ILCS 405/2-3(2)(i), (2)(ii), (1)(b) (West 2010). Mr. M. also argues the court erred in finding Kihara was neglected due to an injurious environment, pursuant to the Act. 705 ILCS 405/2-3(1)(b) (West 2010).

¶ 49    In a proceeding for the adjudication of abused or neglected minors, the State must prove the allegations in the petition by a preponderance of the evidence. *In re F.S.*, 347 Ill. App. 3d 55, 62 (2004); *In re Marcus H.*, 297 Ill. App. 3d 1089, 1095 (1998). " 'Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not.' " *In re F.S.*, 347 Ill. App. 3d at 62 (quoting *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997)). The court's primary concern is the best interests of the children involved. *In re Marcus H.*, 297 Ill. App. 3d at 1095. " 'The trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses and, therefore, is in the best position to determine the credibility and weight of the witnesses' testimony.' " *In re F.S.*, 347 Ill. App. 3d at 63 (quoting *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001)). Cases adjudicating abuse and neglect are *sui generis* and must be decided on their own facts. *In re B.H.*, 389 Ill. App. 3d 316, 319 (2009). We will not disturb the trial court's findings that the children have been abused or neglected, unless those findings are against the manifest weight of the evidence, meaning " 'the opposite conclusion is clearly evident or *** the determination is unreasonable, arbitrary, and not based on the evidence.' " *In re D.W.*, 386 Ill. App. 3d 124, 134-35 (2008) (quoting *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004)).

¶ 50             A. The Trial Court's Finding That Juan Was Physically Abused

¶ 51    The trial court's finding, that Juan was physically abused, was made pursuant to section 2-3(2)(i) of the Act, which states:

    "(2) Those who are abused include any minor under 18 years of age whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:

        (i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function[.]" 705 ILCS 405/2-3(2)(i) (West 2010).

¶ 52    "Section 2-3(2)(i) requires only that the physical injury occur by 'other than accidental' means; it does not require specific intent to harm or punish the child." *In re F.S.*, 347 Ill. App. 3d at 63.

¶ 53 In the present case, the trial court found Doctor Jones's testimony to be "unrebutted" and "persuasive to establish that [Juan] was intentionally and not accidentally abused, physically abused such that it caused a skull fracture and other injuries." Mr. M. first argues the trial court erred in qualifying Doctor Jones as an expert in pediatrics and child-abuse pediatrics who could render an opinion as to the cause of Juan's injuries. "Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." *Reed v. Jackson Park Hospital Foundation*, 325 Ill. App. 3d 835, 842 (2001). "Whether a witness is sufficiently qualified to testify as an expert is a matter committed to the sound discretion of the trial court, whose determination on the issue may be reversed only if it constitutes a clear abuse of that discretion." *In re Beatriz S.*, 267 Ill. App. 3d 496, 499 (1994).

¶ 54 The trial court committed no clear abuse of discretion by qualifying Doctor Jones as an expert in pediatrics and child-abuse pediatrics. As discussed above, Doctor Jones is a graduate of the University of Illinois Medical School, is board certified in pediatrics, and is an assistant professor of pediatrics at Loyola. She is the physician representative of the child advocacy team at Loyola, where she is responsible for all child-abuse and neglect consultations there. She is also a fellow at the American Academy of Pediatrics and a member of the child-abuse and neglect section there. From October 2009 to February 2011, she worked for Aunt Martha's Youth Services and Healthcare, where she coordinated medical care for children involved in DCFS and she evaluated children for abuse and neglect. Over the course of her career, she has consulted on thousands of pediatric cases and on over 100 cases involving suspected abuse or neglect. A month prior to her testimony, Doctor Jones evaluated a suspected child-abuse case which, similar to here, involved a skull fracture. Based on Doctor Jones's education, knowledge, skill, experience and training, the trial court committed no clear abuse of discretion in qualifying her as an expert in pediatrics and child-abuse pediatrics to assist the trier of fact in understanding whether Juan's injuries were caused by neglect and/or abuse.

¶ 55 Mr. M. next argues that the court erred in relying on Doctor Jones's testimony, as her opinion that Juan's injuries were nonaccidental was speculative and, therefore, insufficient to support a finding of physical abuse.

¶ 56 Mr. M.'s argument is without merit. At the adjudicatory hearing, Doctor Jones testified that skull fractures, such as those suffered by three-month-old Juan, are always caused by trauma. Due to the malleability of an infant's skull, a "significant amount of pressure" would have been needed to cause Juan's fractures. Doctor Jones noted Juan was not ambulatory at the time of his fractures and bruising and he did not have the developmental capability to inflict the fractures or bruise on himself. Doctor Jones rejected the argument that Juan's injuries occurred when he hit himself with the bracelet he was wearing because, as Doctor Jones again noted, Juan did not have the motor skills to self-inflict those injuries. Doctor Jones testified that although skull fractures in infants can be caused by accident, and are not necessarily uncommon, the parents should have been able to provide a history of how the fractures occurred. Mr. and Mrs. M. were unable to provide such a history. Further, although Doctor Jones was unable to definitively determine the age of the fractures, the evidence

indicated the two fractures occurred at different times, making it more improbable that the parents would be unable to explain the injuries. Specifically, Doctor Jones noted there was soft-tissue swelling over the left-parietal skull fracture indicating it was an "acute injury, not an injury that could have happened two-and-a-half-months ago" during his birth; Doctor Jones observed no such swelling over the occipital fracture. Moreover, the Loyola surgeon who consulted on Juan's case stated in the neurosurgery consult section of the medical records, that there was a "left parietal bone fx *** as well as evidence of older skull fractures." Doctor Jones testified that based on the medical evidence and the lack of an explanation for Juan's multiple skull fractures and bruising, her opinion to a reasonable degree of medical certainty was that the injuries were caused by "nonaccidental trauma." Doctor Jones's testimony was not speculative but, rather, was based on the medical evidence and on her own expertise in pediatrics and child abuse. Doctor Jones's testimony supported the trial court's finding that the State met its burden of proving by a preponderance of the evidence that Juan was physically abused; accordingly, the court's finding was not against the manifest weight of the evidence.

¶ 57    Mr. M. argues the trial court erred in disregarding Doctor Tuason's testimony that Mr. and Mrs. M. provided adequate care for Juan prior to his injuries. Mr. M. argues the care and attention a child receives prior to an injury is a factor to be considered in determining whether the injury was accidental or not. Review of the record indicates the court did not disregard Doctor Tuason's testimony regarding Mr. and Mrs. M.'s care of Juan prior to March 11, 2011. Rather, the court merely noted, at the close of the adjudicatory hearing, that Doctor Tuason had offered no opinion relative to the cause of Juan's injuries, and the court correctly found that Doctor Jones's testimony regarding causation was unrebutted.

¶ 58    Mr. M. argues the trial court erred in relying on Doctor Jones's testimony because she failed to adequately investigate whether Kihara could have caused Juan's fractures. We disagree. During the course of her investigation, Doctor Jones spoke with both parents as well as with Juan's pediatrician, Doctor Tuason, none of whom identified Kihara as a possible cause of Juan's multiple fractures. Mr. M. points to Doctor Tuason's testimony at the adjudicatory hearing that she told Mrs. M. not to leave Kihara alone with Juan because Kihara was "very active" and liked to "grab whatever she finds interesting." However, Doctor Tuason never testified that Kihara could have been responsible for fracturing Juan's skull.

¶ 59    In sum, Doctor Jones gave unrebutted expert testimony that Juan's injuries were the result of nonaccidental trauma. A trial court " 'cannot disregard expert medical testimony that is not countervailed by other competent medical testimony or medical evidence.' " *In re F.S.*, 347 Ill. App. 3d at 64 (quoting *In re Ashley K.*, 212 Ill. App. 3d 849, 890 (1991)). Based on Doctor Jones's testimony, the trial court's finding that the State met its burden of proving Juan was physically abused was not against the manifest weight of the evidence.

¶ 60    We further note, the trial court's inability to determine which parent, if any, perpetrated the physical abuse, does not compel a different result. We have held "the focus of an adjudicatory hearing is not on whether the respondent abused the minor but rather on whether the minor was abused." *In re J.C.*, 2011 IL App (1st) 111374, ¶ 20. As discussed, Doctor Jones's testimony supported the trial court's finding that Juan was physically abused. As the

-11-

court's finding was not against the manifest weight of the evidence, we affirm.

¶ 61            B. The Trial Court's Finding That Juan Was Abused Due to
                        a Substantial Risk of Physical Injury

¶ 62    The trial court's finding that Juan was abused due to a substantial risk of physical injury was made pursuant to section 2-3(2)(ii) of the Act, which states:

> "(2) Those who are abused include any minor under 18 years of age whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:
>
> ***
>
> (ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function[.]" 705 ILCS 405/2-3(2)(ii) (West 2010).

¶ 63    The same evidence that supports the physical-abuse finding also supports the court's finding that the State proved, by a preponderance of the evidence, Juan was abused due to a substantial risk of physical injury. As the court's finding pursuant to section 2-3(2)(ii) of the Act was not against the manifest weight of the evidence, we affirm.

¶ 64    C. The Trial Court's Finding That Juan and Kihara Were Neglected Due to
                        an Injurious Environment

¶ 65    The trial court's finding that Juan and Kihara were neglected due to an injurious environment was made pursuant to section 2-3(1)(b) of the Act, which provides a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2010). "Neglect is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re D.W.*, 386 Ill. App. 3d at 135. The term "neglect" has a fluid meaning that varies with the facts and circumstances of each case. *In re R.R.*, 409 Ill. App. 3d 1041, 1045 (2011). "An injurious environment is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *In re D.W.*, 386 Ill. App. 3d at 135.

¶ 66    The same evidence that supports the physical-abuse finding and the finding of abuse due to a substantial risk of physical injury supports the finding that the State proved, by a preponderance of the evidence, that Juan was neglected due to an injurious environment. We have held: "[p]roof of neglect of one minor is admissible evidence on the issue of neglect of any other minor for whom the parent is responsible." *In re R.R.*, 409 Ill. App. 3d at 1045. Thus, the evidence supporting the neglect finding for Juan also supports the neglect finding for his sister Kihara, who lived in the same house as Juan and for whom Mr. and Mrs. M. were responsible. As the court's finding pursuant to section 2-3(1)(b) was not against the

manifest weight of the evidence, we affirm.

¶ 67                                                 D. The Dispositional Order

¶ 68        The trial court held a dispositional hearing and found both parents unable to care for Juan and Kihara. The court made Juan and Kihara wards of the court and placed them under DCFS guardianship. "Pursuant to section 2-27(1) of the Act, a trial court may commit a minor to wardship upon a determination that the parent is unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the parent." *In re Gabriel E.*, 372 Ill. App. 3d 817, 828 (2007) (citing 705 ILCS 405/2-27(1) (West 2004)). "The trial court's determination regarding this will be reversed only if the factual findings at the dispositional hearing are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *In re Gabriel E.*, 372 Ill. App. 3d at 828.

¶ 69        Mr. M.'s only argument is we should reverse the dispositional order because the trial court erred at the adjudication hearing in finding Juan and Kihara were abused and neglected. As discussed above, we affirm the court's findings at the adjudication hearing; accordingly, Mr. M.'s argument, that the dispositional order should be reversed based on errors in the underlying adjudicatory order, is without merit. In the absence of any other arguments, we affirm the dispositional order.

¶ 70        We further note we would affirm even if Mr. M. had otherwise argued the findings at the dispositional hearing were against the manifest weight of the evidence. As discussed above, Ms. Aldana, the Catholic Charities caseworker assigned to the case, testified at the dispositional hearing that both parents had been assessed for services and needed parenting classes, parenting coaching, and individual therapy. Although the coach who conducted the parenting classes was pleased with their cooperation, individual therapy had not yet begun because the agency only had two Spanish-speaking counselors. Ms. Aldana recommended the children be made wards of the court and placed in DCFS guardianship due to the ongoing service needs of the parents. The trial court also admitted a DCFS-integrated assessment of the family which noted that while Mr. M. had exhibited some parenting strengths, he also displayed a weakness by not being able or willing to ensure Juan's safety. The assessment also noted Mr. M.'s tendency to blame Juan's injuries on the hospital or the DCFS investigator. During closing arguments, Mr. M. concurred with the State's and the public guardian's request that the children be made wards of the court, the parents be found unable to care for them, and the children be placed under DCFS guardianship. Accordingly, Mr. M. has waived review thereof. *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011).

¶ 71        Even in the absence of waiver, all this evidence shows that while both parents have shown a willingness to cooperate with DCFS, they were not able to care for Juan and Kihara at the time of the dispositional hearing. Accordingly, the factual findings underlying the court's dispositional order are not against the manifest weight of the evidence, and the court did not abuse its discretion by selecting an "inappropriate" dispositional order. *In re Gabriel E.*, 372 Ill. App. 3d at 828. We affirm.

¶ 72                              II. Mrs. M.'s Appeal (No. 1-11-3192)

¶ 73        The public defender of Cook County, who was appointed to represent Mrs. M. on appeal, has filed a motion in this court for leave to withdraw as counsel based on his conclusion that there are no meritorious issues to be raised. Although the motion cited *Pennsylvania v. Finley*, 481 U.S. 551 (1987), counsel has filed a brief referring to matters that might, arguably, support an appeal, complying with the stricter standard for withdrawal established in *Anders v. California*, 386 U.S. 738 (1967). Copies of the motion and brief were sent to Mrs. M. and she was advised she could submit any points in support of this appeal. She has not responded.

¶ 74        We have carefully examined the record and the aforesaid brief and have found no issues of arguable merit to be asserted on appeal. Accordingly, we grant the motion of the public defender of Cook County for leave to withdraw as counsel and affirm the judgment of the circuit court.

¶ 75        For the foregoing reasons, we affirm the circuit court.

¶ 76        Affirmed.