NOTICE

Decision filed 10/27/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210159-U

NO. 5-21-0159

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* NOAH P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-8 |
| | ) | |
| Bryan P., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The dispositional order of the circuit court of Marion County that found the respondent unfit, for reasons other than financial circumstances alone, and found it to be in the best interest of the minor child to make the minor child a ward of the court, is affirmed because the trial judge did not err when she determined, as a basis for her findings, that the respondent was in need of domestic violence services and needed to obtain suitable housing for the minor child.

¶ 2   The respondent, Bryan P., appeals the dispositional order of the circuit court of Marion County that found him unfit, for reasons other than financial circumstances alone, and found it to be in the best interest of the respondent's biological minor child, Noah P.

1

(Noah), to make Noah a ward of the court. We note that this is an expedited appeal, with our decision due by November 1, 2021. For the following reasons, we affirm the order of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4     This case began with the filing, on January 22, 2021, of, *inter alia*, a petition for adjudication of wardship, in which the State alleged that Noah, who was born February 29, 2020, was neglected, due to the fact that his parents—the respondent, who is his biological father, and Tiffany M. (Tiffany), who is his biological mother—were "frequently involved in acts of domestic violence against each other in" Noah's presence, which created an environment that was unsafe for Noah. The petition asserted that Noah was in protective custody and asked that Noah be made a ward of the court. The State also filed a motion for temporary custody, asking that Noah be placed in shelter care.

¶ 5     On January 25, 2021, a hearing was held, via Zoom, on the State's filings. The State's first witness was Tera Romines, who testified that she was a child protection specialist with the Illinois Department of Children and Family Services (DCFS). She testified that on January 21, 2021, she was preparing to update a safety plan for Tiffany that had been put in place by a coworker who was then on vacation. She testified that the safety plan was created because of "constant domestic violence reports between [the respondent] and Tiffany, between Tiffany and her brother, Tiffany and her mother." Romines testified that the safety plan required other people to be present when Tiffany was with Noah. She testified that she believed the safety plan was put into place in early January 2021. She testified that the safety plan was required because Tiffany was

2

"unpredictable and out of control." When asked to give examples of this behavior, Romines testified that in October 2020, DCFS received three domestic violence reports regarding Tiffany, one of which involved the respondent and took place in the presence of Noah. She testified that on January 21, 2021, as she was on her way to Tiffany's residence to update the safety plan, she received a call from her supervisor, who told her that another report had been received from the police that Tiffany and the respondent "had got into another domestic" the previous morning, and that Romines was to take Noah into protective custody. She testified that Noah was not present during this most recent domestic violence incident. Romines testified that she attempted to contact the respondent three times on January 21, 2021, but that he did not call her back until January 22, 2021. She testified that the respondent wanted to take custody of Noah, but that she explained to him the procedures that had to be followed. She testified that Noah was placed with his maternal grandmother. On cross-examination, when questioned by the trial judge, Romines testified that, according to her records, the respondent had "five convictions for assault and one conviction for a traffic offense."

¶ 6    Tiffany was the next witness to testify. She testified that she did not wish for the respondent "to have any visitation rights at all" with Noah. She testified that the respondent "can't keep his hands off" her and had treated her family badly. The respondent was given the opportunity to testify but declined to do so. Thereafter, the guardian *ad litem* (GAL) appointed to represent Noah stated that she wished to make a recommendation. She stated that she believed Noah was "living in a war zone," and she recommended that he be placed in shelter care. She further recommended that both

3

Tiffany and the respondent be referred for domestic violence and mental health evaluations "immediately."

¶ 7    The trial judge stated that, after considering the evidence, she found probable cause that Noah had been neglected and found that there was an immediate and urgent necessity that Noah be placed in the temporary care of DCFS. She appointed separate attorneys to represent Tiffany and the respondent in future proceedings. She also ordered Tiffany and the respondent "to immediately get assessments for mental health counseling and for domestic violence counseling." She ruled that visitation, supervised by DCFS, would be allowed. She thereafter filed a written order that was consistent with her oral pronouncement.

¶ 8    On February 10, 2021, a first appearance with counsel hearing was held. The respondent did not appear at the hearing, although his counsel was present. The parties who were present, including the GAL, all expressed concern about DCFS's initial placement of Noah with his maternal grandmother, and noted that the placement had been terminated once it was realized that both the maternal grandmother and her paramour had "indicated reports" that made the placement untenable and placed Noah in a perilous situation. They also noted the fact that the maternal grandmother's home had been condemned and was subject to a demolition order. The trial judge concurred with their concerns and shared them with legal counsel for DCFS, who was present as well. The case was set for a pretrial hearing on March 10, 2021.

¶ 9    A report that was filed on February 8, 2021, by Lindsie Pries and Stephanie Perez of Caritas Family Solutions for use at the February 10, 2021, hearing also is contained in

4

the record on appeal. The report references a December 20, 2020, "domestic dispute" between the respondent and Tiffany, references their previous "history of domestic violence with police and DCFS being involved," and "history of Tiffany and [the respondent] being aggressive towards each other with [Noah] present, and the adult having injuries." The report also references the aforementioned January 20, 2021, incident, at which Noah was not present. The report states that attempts to reach the respondent had been unsuccessful. Thus, no progress was reported on "mental health" or on "domestic violence."

¶ 10    On March 10, 2021, the pretrial hearing was held. The respondent was present, as was his counsel. The parties all agreed that the case should be set for an adjudicatory hearing, which was then scheduled for April 28, 2021. A report that was filed by Pries and Perez on March 1, 2021, for the March 10, 2021, hearing also is included in the record on appeal. In addition to the information found in the previous report, the new report indicates that on March 1, 2021, contact had been made with the respondent and the respondent had been informed of the "integrated assessment process and possible services to be completed for Noah to safely return home," with regard to, *inter alia*, mental health and domestic violence. Also on March 10, 2021, the trial judge entered an order in which she appointed a Court Appointed Special Advocate (CASA) in this case.

¶ 11    On April 19, 2021, Pries and Perez filed another updated report, this one for use at the upcoming April 28, 2021, adjudicatory hearing. The updated information included the fact that the respondent had "participated in an integrated assessment" for, *inter alia*, mental health, and for domestic violence, on April 13, 2021, and that on April 20, 2021,

5

service plan recommendations would be outlined both for mental health and domestic violence. With regard to the respondent's housing situation, the report stated that the respondent reported that he "resides in a garage that he fixed up into a one-bedroom house" and that further could be modified so that there would be two bedrooms and Noah could have his own bedroom. The report further stated, under the domestic violence section, that the respondent also had been assessed "for Men Challenging Violence and was not recommended for services at this time."

¶ 12    At the outset of the April 28, 2021, hearing, the State announced that it had "just filed an amended petition for adjudication of wardship" that slightly changed the wording of the allegations. The amended petition stated that Tiffany and the respondent were "frequently involved in acts of domestic violence in" Noah's presence, which created an environment that was unsafe for Noah. In other words, the amended petition deleted the words "against each other" from the original petition, with reference to the acts of domestic violence. Both Tiffany and the respondent agreed, on the record, to admit to the contents of the amended petition. The State thereafter presented a factual basis for the allegations in the amended petition. The trial judge found the factual basis to be adequate and set the cause for a dispositional hearing. She explained to Tiffany and the respondent that, at the dispositional hearing, the question would be what was in Noah's best interests, and that she would also decide, *inter alia*, whether Tiffany and the respondent had been offered appropriate services, whether they had engaged in those services, and whether they were "trying to correct the reasons why Noah was taken away from you in the first place." She admonished Tiffany and the respondent to comply with their service plans.

She thereafter entered a written adjudicatory order in which she found Noah to be neglected, and in an environment that was injurious to Noah, based upon the fact that Noah's "parents engage in acts of domestic violence in" Noah's presence. She specifically found that the neglect was inflicted by both parents.

¶ 13   On May 19, 2021, presumably in anticipation of the upcoming dispositional hearing, Pries and Perez filed a 46-page family service plan, a 9-page integrated assessment, and a 9-page dispositional hearing report, the latter of which was essentially an update of the earlier reports discussed above. On May 21, 2021, also presumably in anticipation of the upcoming dispositional hearing, the CASA filed a report. Various health records and developmental assessments for Noah were also filed.

¶ 14   The dispositional hearing was held on May 26, 2021. The first witness to testify was Lindsie Pries. She testified that she was a foster care case manager for Caritas Family Solutions, and that she had been the manager of this case since the end of January 2021. She testified that the respondent had been recommended for mental health services but that, other than completing his integrated assessment, he had not participated in any mental health services. With regard to the respondent's housing situation, she testified that although she had spoken with the respondent about meeting to see if his one-bedroom house could be converted into a two-bedroom house, the respondent had later contacted her "with unfortunate news that his home had caught fire." She testified that the respondent told her that the damage from the fire was "extensive" and that he was "having to rebuild." She testified that she had not been able to view the home. She agreed, therefore, that she could not presently state whether the home would be safe for

Noah to inhabit. When asked what type of structure the home was, she testified that the respondent told her "it was a garage that he converted into a home." She testified that the respondent was presently unemployed and had not shown up for a scheduled drug test on April 20, 2021.

¶ 15 At that point in the proceedings, the respondent interrupted, expressing his frustration that he was not allowed to talk. He was admonished that he would get an opportunity, and that he was represented by counsel. He apologized. The trial judge told the respondent that she had heard him use profanity, and that she could hold him in contempt of court. She told him not to do it again, and he apologized again.

¶ 16 Pries then continued with her testimony. She testified that the respondent reported to her that he completed an assessment for domestic violence services, and that he was not recommended for services. She testified that she was suggesting that he receive another assessment for domestic violence services, because she "was not sure if the person screening [the respondent] at the time had all of the correct information with the domestic violence incidents between him and Tiffany."

¶ 17 On cross-examination by the respondent's counsel, she agreed that the assessment stated that the respondent was not recommended for services, and that it stated that the respondent had "not reoffended or had any new domestic violence history since the previous charge in 2014 which he completed treatment for." She agreed that she was aware that the respondent's trial counsel (who is different from his counsel on appeal) had informed her and Stephanie Perez that counsel had spoken with the domestic violence assessor and had "described the state of the current reports we had and even

8

offered to send those reports to" the assessor. She agreed that counsel told her and Perez that the assessor told counsel the assessor did not need the reports and not to send them. She stated that she had not spoken to the assessor since that time.

¶ 18 On cross-examination by the GAL, Pries testified that the domestic violence assessment referred to by the respondent's trial counsel was different than, and prior to, the respondent's integrated assessment, and that the initial assessor did not have all the information that was available to Pries following the integrated assessment. Pries was asked, in her experience as a social worker, if it was true that if the respondent had not been truthful with the initial assessor, it was possible that the initial assessor would conclude that the respondent did not need domestic violence services. She answered, "Correct."

¶ 19 On recross-examination by the respondent's counsel, Pries agreed that by getting his initial domestic violence assessment, apart from the integrated assessment, the respondent was doing what he had been asked to do. She agreed that she had not contacted the initial assessor to see if the respondent had been truthful with him, and that anything related to the respondent's truthfulness with the initial assessor was "pure speculation."

¶ 20 The respondent testified next. He testified, with regard to the fire at his residence, that his "couch caught on fire," and that "[t]hat's the only room that received any damage besides the smoke damage throughout the house." He testified that he purchased cleaning supplies, that he had been cleaning up from the fire, and that "right now, I just need to paint." He added, "That's all I've got left to do, and I'll be back to livable conditions."

He further stated that he had "about a week's worth of work left, and it will be done." On cross-examination by the State, he was asked if he needed another week to make the house livable. He replied, "No. Where it looks good." He added, "I'm living here right now." On cross-examination by the GAL, he testified that the house currently had only one bedroom, but that he could add "[a]s many as I need to add."

¶ 21 Following the respondent's testimony, the GAL was asked for her recommendation. She stated that although she appreciated the respondent "engaging and getting assessments," she was very concerned that no services were recommended for the respondent, "considering the history and the reason Noah was brought into care, which is continued domestic violence issues between mother and father." She stated that if a parent is not honest with an assessor, services will not be recommended, and that to her it was "incredibly frustrating and troubling" that the initial assessor did not wish to see additional documentation in this case. She stated that the respondent should continue to engage in services and stated that "at this time it is absolutely in little Noah's best interest that he be placed in the custody and guardianship of [DCFS] while both parents work their service plan and correct the conditions that brought little Noah into care." She then stated that Noah was "in a wonderful foster home" and "thriving," as noted in the CASA report.

¶ 22 The State agreed and added that although the respondent had been "proactive" in terms of getting assessments, the State shared the GAL's concerns about the lack of recommended services for the respondent with regard to domestic violence, and stated that if the integrated assessment was shared with the initial assessor, a different result

10

might occur. The State also expressed concerns about the respondent's housing situation, because the caseworker had not been able to evaluate it yet. The State, therefore, agreed that Noah should remain "in the custody and guardianship of DCFS while parents continue to work their services."

¶ 23     Thereafter, the respondent asked if he could speak. The trial judge said no. The respondent's counsel then presented his argument, stating that the respondent had done everything that had been asked of him, and that after receiving assessments for, *inter alia*, mental health and domestic violence, no services had been recommended for him. With regard to the amended petition and domestic violence, counsel suggested that Tiffany instigated the acts of domestic violence, then tried to blame them on others, including the respondent. He argued that "[n]obody has presented any evidence to prove that [the respondent] was an aggressor," which he contended "means Men Challenging Violence would not be appropriate for him." He argued that it was the State's burden to show that the respondent needed domestic violence services, and that the State had not met its burden. He further argued that there was no evidence that the respondent was untruthful in his initial assessment, and that the State had not met its burden with regard to that either. He asked that Noah be placed in the custody of the respondent.

¶ 24     The trial judge stated that she had considered all the evidence. She agreed it was "disturbing" that the initial assessor did not wish to see additional information, and added that the respondent had "put himself back further than he needed to be, and the [initial assessor] did it too." She stated that if she were to allow "a child back into a parent's care under these circumstances, that would mean that a parent would only need to go into an

11

assessor and say I don't have any problems. Assessor says no counseling. Parents get their kids back every time." The trial judge stated that she did not believe that was the intent of the Juvenile Court Act. She added, "That's not the intent of integrated assessments. That is not the purpose of an evaluation. So it's not a valid evaluation until this evaluator receives the collateral information about the reasons why this child was taken into care." She continued that if an evaluator considered all the appropriate information and still decided a parent did not need services, she might make a different decision.

¶ 25    At this point, before she could state what her decision was, the respondent interrupted. The trial judge reminded the respondent that he could be held in contempt of court. The respondent continued with his outburst, at which point the trial judge told him that she was holding him in direct criminal contempt of court, and that whether she issued an immediate warrant for his arrest depended upon whether he could "hold it together" for the rest of the hearing. The respondent again apologized.

¶ 26    Thereafter, the trial judge continued with her ruling. She stated that it had "been reported by CASA that the home is unlivable." She stated that she did not fault the respondent for the fire, but that she had to take the condition of the home into consideration. She noted the placement mistake DCFS made early in the case, which she characterized as "ridiculous" and ordered Pries "to provide all of the collateral information in her possession regarding the reasons this child was taken into care and any other information regarding the history of these parents to whatever evaluator" the respondent would next see. She further ordered the respondent "to attend that evaluation

12

and be honest." She ruled that it was "in the best interest of this child that custody and guardianship be given to [DCFS]." She stated that she would set a permanency hearing in 90 days. She informed the respondent that she would withhold sentencing on the direct criminal contempt case until that time.

¶ 27 Thereafter, but still on May 26, 2021, the trial judge filed her written dispositional order. Therein, she found, *inter alia*, that the respondent was unfit, for reasons other than financial circumstances alone, because he "need[ed] new domestic violence assessment and to confirm home is safe and appropriate for minor." She thereafter stated that the facts forming the basis of her ruling were that "parents need to engage in services and obtain suitable housing." She ruled that the current service plan was appropriate. She granted the amended petition and ordered Noah be made a ward of the court. The order set the date of the permanency hearing as August 25, 2021. The respondent filed a notice of appeal on June 4, 2021, and this appeal of the dispositional order followed.

¶ 28                                    II. ANALYSIS

¶ 29 The sole issue raised on appeal by the respondent is his contention that the trial judge erred in her dispositional order because, according to the respondent, the State failed to prove by a preponderance of the evidence in the dispositional hearing that it was in Noah's best interest to be made a ward of the court. Specifically, the respondent argues on appeal that the trial judge was inappropriately "erring on the side of caution" rather than acting on the evidence before her. The respondent then turns to the trial judge's finding of unfitness, noting that the trial judge's order stated that the respondent "need[ed] new domestic violence assessment and to confirm home is safe and appropriate

13

for minor." The respondent discusses the evidence regarding the safety of his home, and his purported need for a new domestic violence assessment, contending that, with regard to each, the evidence does not support the trial judge's order. He contends that "no one had been in the home for over a month when the dispositional hearing took place," and that the respondent's testimony was that he was almost finished repairing the home. He insinuates, but does not directly argue, that a formal home visit should have taken place prior to the hearing. However, he does not cite any legal authority, or make any coherent argument, in support of such a proposition. Accordingly, the respondent has forfeited consideration of any such argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing).

¶ 30    The respondent also contends on appeal that, with regard to his domestic violence assessment, he did what he was asked to do, "and no services were recommended." He notes that his trial counsel offered to provide additional documents to the initial assessor, but the assessor did not want them. He adds that "[t]here was zero follow up by [DCFS] on why the assessor did not need to see the documents," and that the State did not call the assessor as a witness. He contends that there was an assumption that he was not truthful with the assessor but no evidence adduced to support that assumption. He repeats his trial-court argument that there is also no proof that he was the aggressor in the incident that led to Noah's removal. He cites no legal authority, and makes no coherent argument, in support of the proposition that the State was required to prove that he was the

14

aggressor, rather than that, as the amended petition alleged and as he admitted to the trial judge, he engaged in acts of domestic violence in Noah's presence. Accordingly, the respondent has forfeited consideration of any such argument. See *id.*

¶ 31    As the State notes in its brief on appeal, this court may affirm a judge's ultimate ruling on any basis supported by the record. See, *e.g.*, *Evans v. Lima Lima Flight Team, Inc.*, 373 Ill. App. 3d 407, 418 (2007); *People v. Johnson*, 208 Ill. 2d 118, 134 (2003). We may do so because the question before us on appeal is the correctness of the result reached by the judge, rather than the correctness of the reasoning upon which that result was reached. *Johnson*, 208 Ill. 2d at 128.

¶ 32    Where, as here, an appellant argues that the State failed to prove by a preponderance of the evidence that it was in a minor child's best interest to be made a ward of the court, the following legal principles are relevant to our review of the trial judge's dispositional order. At a dispositional hearing, a trial judge is charged with determining "whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 21 (citing 705 ILCS 405/2-21(2) (West 2010)). We will reverse a trial judge's dispositional order only if the factual findings at the dispositional hearing are against the manifest weight of the evidence before the trial judge, or if the trial judge abused the judge's discretion by selecting an inappropriate dispositional order. See, *e.g.*, *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 68. It is well established that factual findings are against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, or not based upon the evidence presented. *Id.*

15

¶ 49. It is also well established that a trial judge, in comparison to a reviewing court, is better situated to observe the demeanor and conduct of the parties and witnesses and, therefore, is in a better position to determine the credibility and weight to be afforded to the witnesses' testimony. *Id*. A trial judge commits an abuse of discretion by selecting an inappropriate dispositional order only if the trial judge's selection is arbitrary, fanciful, or so unreasonable that no reasonable person would take the view adopted by the trial judge. See, *e.g.*, *In re H.C.*, 2019 IL App (1st) 182581, ¶ 32.

¶ 33  In light of the respondent's arguments on appeal, we begin by noting that the trial judge in this case never ruled that the respondent was not truthful during his initial domestic violence assessment, and no such ruling was required to support the ultimate ruling of the trial judge in this case. A reasonable trial judge could have concluded that, regardless of whose fault it was—and regardless of whether there was any intentional concealment by the respondent, or even possibly unintentional concealment, due to inadequate memory—the respondent's domestic violence assessment was flawed, because it involved a process whereby the assessor was offered additional relevant information about the respondent and this case, and refused to consider it. Indeed, the trial judge's pronouncement was not that the respondent was untruthful, but that "it's not a valid evaluation until this evaluator receives the collateral information about the reasons why this child was taken into care." She continued that if an evaluator considered all the appropriate information and still decided a parent did not need services, she might make a different decision. Thus, her conclusion was that the *assessment* was not reliable and valid, not necessarily that the respondent bore some or all of the blame for this. Her

16

concerns reflected those of both the GAL and the State, who also took issue with the process by which the assessment was produced. The respondent has put forward no argument, and cited no case law, in support of the proposition that a trial judge errs when the judge disregards an assessment that the judge finds to be based upon an inadequate inquiry process or to be otherwise not reliable or valid, and orders a new assessment to replace the discarded one. Accordingly, the respondent has forfeited consideration of any such argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Forfeiture notwithstanding, we are aware of no legal authority that would fetter a trial judge's discretion in such a manner, as long as the exercise of that discretion is reasonable and is not abused, nor are we aware of any legitimate legal or public policy reasons to so fetter the discretion of a trial judge.

¶ 34 In addition, we believe that a reasonable trial judge could conclude, based upon the evidence presented in this case, that the State met its burden to prove by a preponderance of that evidence that it was in Noah's best interest to be made a ward of the court. As this court has long held, a preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact or facts at issue are more probable than not. *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 49. In this case, there was ample evidence from which the trial judge could conclude that the respondent was unfit because he was in need of a new assessment for domestic violence services, and because the home

17

he proposed to provide for Noah was not yet safe enough for Noah to inhabit it, and that therefore it was in Noah's best interests to be made a ward of the court.

¶ 35    With regard to a new assessment for domestic violence services, we have already established that the trial judge did not err when she disregarded the flawed assessment provided to the court. As described in detail above, apart from that assessment, there was voluminous evidence that the respondent engaged in domestic violence in the presence of Noah, including his own admission of such at the April 28, 2021, adjudicatory hearing. At no point in these proceedings did the respondent deny that he engaged in domestic violence in the presence of Noah. Even if he had made such a denial, and had attempted to repudiate his admission to the allegations in the amended petition, there was circumstantial evidence—in addition to the documentary evidence described above— from which the judge could have concluded that it was more probable than not that the respondent had engaged in the acts of domestic violence of which he was accused and that prudence dictated a new assessment in this case. The foremost piece of this evidence was the respondent's own behavior at the proceedings in this case, where he showed an inability to control himself and ultimately was held in direct criminal contempt of court. Because the respondent could not control himself when in full view of the court, it would be reasonable for the trial judge to infer that he also could not control himself when not under the watchful eye of the court system, and that his lack of self-control certainly could have led him to engage in acts of domestic violence. Accordingly, in light of the respondent's documented history of recent domestic violence, including his admission thereto, and his behavior before the court, it was not error for the trial judge to conclude

18

that he was presently unfit to care for Noah because he was in need of a new assessment for domestic violence services, and to conclude, therefore, that it was in the best interest of Noah to be made a ward of the court.

¶ 36    With regard to the safety of the home the respondent proposed to provide for Noah, the respondent's own testimony belies his contentions on appeal. When asked on direct examination about his repairs, the respondent testified that "right now, I just need to paint," then added, "That's all I've got left to do, and I'll be back to livable conditions." There is no reasonable way to interpret this testimony other than to mean that at the time of the hearing the house was not yet livable, for if it was, it would be nonsensical for the respondent to testify that the house would be "*back to* livable" (emphasis added) once he completed the work he had not yet completed. Although it is true that, on cross-examination by the State, the respondent attempted to change his testimony to imply that because he presently lived in the house, it was also presently livable for Noah, the trial judge was free to disregard the respondent's attempt to change his testimony, because, as explained above, a trial judge is in a superior position to this court to observe the demeanor and conduct of the parties and witnesses and, therefore, is in a better position to determine the credibility and weight to be afforded to the witnesses' testimony. See, *e.g.*, *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 49. This is particularly true in light of Pries's testimony that the respondent told her that the damage from the fire was "extensive" and that he was "having to rebuild." Moreover, it is undisputed that, at the time of the hearing, the house was still a one-bedroom house, and that no one from DCFS had yet been able to assess the house to see if it could be

converted into a two-bedroom house that would be appropriate for the respondent and Noah. In addition, the CASA noted in her report, dated approximately two weeks prior to the dispositional hearing, that she had "been by" the respondent's house, and that it "look[ed] unlivable." Later in her report, she added that it did "not look livable, especially for a child." Thus, there was sufficient evidence from which the trial judge reasonably could have concluded that it was more probable than not that the respondent was still in need of suitable housing for Noah, and that therefore it was in Noah's best interest to be made a ward of the court rather than immediately placed with the respondent in unsuitable living conditions.

¶ 37    In light of the foregoing, we conclude that the opposite conclusion to that reached by the trial judge is not clearly evident in this case, and the trial judge's decision is not unreasonable, arbitrary, or not based on the evidence. Accordingly, the trial judge's decision is not against the manifest weight of the evidence. *Id.* Moreover, the trial judge's selection of the dispositional order in this case was not arbitrary, fanciful, or so unreasonable that no reasonable person would take the view adopted by the trial judge, and therefore the selection was not an abuse of the trial judge's discretion. *In re H.C.*, 2019 IL App (1st) 182581, ¶ 32.

¶ 38                                III. CONCLUSION

¶ 39    For the foregoing reasons, we affirm the judgment of the circuit court of Marion County that found the respondent unfit, for reasons other than financial circumstances alone, and found it to be in Noah's best interest to be made a ward of the court.

20

¶ 40    Affirmed.