2025 IL App (2d) 240741-U
No. 2-24-0741
Order filed April 28, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* J.C., III, a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 24-JA-90 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Jessica W., | ) | Carl E. Metz, II, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court did not err when it found the subject minor neglected and abused, ordered that he be made a ward of the court, and found respondent unfit.

¶ 2   Following adjudicatory and dispositional hearings in the circuit court of McHenry County, the trial court adjudicated the minor, J.C., III, as abused and neglected under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(2)(ii), 2-3(1)(b) (West 2022)), and found that it was in the minor's best interest that he be made a ward of the court and placed in the custody and guardianship of the Department of Children and Family Services (DCFS) (*id.* § 2-27)). Respondent, Jessica W., the minor's mother, appeals from these orders. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    The minor was born August 2, 2024.  On August 5, 2024, the State filed a petition for adjudication of wardship of the minor, alleging that he was an abused or neglected minor and that it was in his best interests to be adjudged a ward of the court.  *Id.* § 2-3(1).  Specifically, the State alleged that the minor was neglected due to an environment injurious to his welfare (*id.* § 2-3(1)(b)) and abused due to substantial risk of physical injury (*id.* § 2-3(2)(ii)).

¶ 5                                    A. Adjudicatory Hearing

¶ 6    On October 22, 2024, the trial court held an adjudicatory hearing on the State's petition. The State requested and the trial court agreed to take judicial notice of the adjudicatory hearing that was held in August and September 2024, in regard to T.W., the minor's older sibling.  See *In re T.W.*, 2025 IL App (2d) 240573-U, ¶¶ 6-20.  The following was revealed at those hearings. There were three incidents in September 2023 where police responded to calls of domestic violence at the Fox Lake home where respondent and T.W. lived.  At that time, respondent and T.W. were living with respondent's mother, Lisa W., and respondent's stepfather, Jeff C., who was also the father of T.W. and the minor.

¶ 7    In April 2024, respondent, Jeff, and T.W. moved to Lake in the Hills.  At the time, respondent was pregnant with the minor.  On April 20, 2024, respondent called for an ambulance to take her to the hospital.  T.W. was in the sole care of respondent and was transported with respondent to the hospital.  Hospital staff contacted DCFS due to a concern about respondent leaving the hospital against medical advice with an elevated blood alcohol content of 0.293 and when T.W. was without adequate clothing.

¶ 8    A few days later, respondent was investigated by the police for an alleged battery in which she attacked a teenager at a park in Lake in the Hills.  T.W. was present at the park and three people needed to pull respondent off of the teenager she attacked.  The teenager suffered injuries and

subsequently had a seizure. When the matter was investigated, respondent initially denied being at the park but later said that, after she told the teenager and her friends to leave the playground because they had allegedly blown smoke in T.W.'s face, the teenage girl attacked her. The record indicates that respondent was later charged with aggravated battery based on this incident (case No. 24-CF-396) and the case was pending. A DCFS investigator testified that respondent had a history of being aggressive with strangers and starting fights.

¶ 9 Finally, the adjudicatory hearing revealed that, at the end of May 2024, when DCFS attempted to take protective custody of T.W., respondent and Jeff fled with her. This resulted in the police having to acquire a search warrant and forcefully enter respondent's home. Respondent and T.W. were found hiding in a closet. Bodycam footage showed that the police approached the closet with guns drawn and had to forcefully drag respondent and T.W. out of the closet. T.W. was upset and screaming. Respondent was later charged with child abduction related to this incident (case Nos. 24-CF-499 and 24-CF-500) and the cases were pending.

¶ 10 The State also admitted respondent's medical records from April 20 until July 29, 2024; respondent's medical records from August 1-3, 2024—her hospital stay when she delivered the minor; and the minor's medical records from August 2-4, 2024—his hospital stay during and after his birth. Respondent objected only to the narratives contained within those medical records but not to the medical information. Respondent also objected to the relevance of any evidence presented at T.W.'s adjudicatory hearing that occurred prior to April 20, 2024, as there was allegedly no evidence that T.W. was present during the alleged incidents of domestic violence or that respondent was pregnant with the minor at the time. The trial court overruled the objection, finding that the information related to T.W. was relevant but that it would certainly consider the weight of that information in reaching any decision. Thereafter, both parties rested.

¶ 11    In closing, the State argued that it had proved the minor was in an environment injurious to his welfare and that respondent created a substantial risk of physical injury.  The State summarized the evidence presented at T.W.'s adjudicatory hearing.  Relying on the admitted medical records, the State noted that, while at the hospital on April 20, 2024, respondent stated that she had not yet received any prenatal care; at respondent's first prenatal visit on April 22, 2024, respondent admitted to consuming alcohol on April 20th; at a May 31, 2024, prenatal visit, respondent stated that she last consumed alcohol on April 23rd.  Medical records also showed that when respondent went to the hospital for an office visit on July 29, 2024, she brought a friend who asked hospital staff numerous questions regarding DCFS and HIPPA and, when respondent's doctor recommended that her labor be induced to reduce the risk of stillbirth, respondent stated she wanted a second opinion and left the hospital.

¶ 12    Other medical records revealed that respondent went to a different hospital on August 1, 2024, and stated that she was there because she did not like the doctor at the original hospital.  In those records, there was a note from a social worker that indicated respondent had called her the day before and asked questions about whether DCFS needed to be contacted when she gave birth.  Respondent asserted that DCFS did not need to be contacted because she was setting up private guardianship for the minor.  The social worker explained that hospital staff, as mandated reporters, were required to notify DCFS.  The social worker noted that there was a male voice in the background asking about a home birth.  The social worker advised against a home birth and encouraged respondent to deliver at a hospital.  Medical records also showed that, when respondent arrived at the second hospital, she denied any alcohol use and gave a false story about why she was involved with DCFS.

¶ 13    The State argued that the trial court could consider the abuse and neglect of T.W. in determining whether the minor was abused or neglected.  The State argued that all the evidence at T.W.'s adjudicatory hearing was relevant because it happened close in time to the minor's birth.  The State further argued that respondent telling lies at the hospital regarding the reason for DCFS involvement showed that respondent was still not taking responsibility for her actions.  Finally, the State noted that the medical records showed that respondent had a history of substance abuse involving alcohol, marijuana, and amphetamines.

¶ 14    Respondent's counsel argued that respondent was not required to seek prenatal care.  Counsel reiterated her objection to relying on narratives in the medical records, such as the unknown male in the background of the phone call with the social worker asking about a home birth.  Counsel noted that respondent gave birth to a healthy baby boy that was immediately released from the hospital.  Counsel also noted that, since April 20, 2024, there was no evidence of drinking or drug use by respondent.  Counsel argued that the State failed to prove that the minor was abused or neglected.

¶ 15    The guardian *ad litem* (GAL) stated that sibling abuse may be *prima facie* evidence of neglect based upon an injurious environment in another case, but acknowledged that the presumption can weaken over time.  The GAL also noted that a court need not wait until a child is actually injured to take action.  The GAL believed that, based on T.W.'s adjudication, the State had met its burden to prove that the minor was abused and neglected.

¶ 16    On October 28, 2024, the trial court rendered its decision.  The trial court stated that it took judicial notice of T.W.'s adjudicatory hearing; case No. 23-OP-1354, an order of protection respondent filed against her mother in December 2023; and case Nos. 24-CF-396 and 24-CF-500, felony matters (aggravated battery and child abduction) involving respondent.  The trial court

stated that T.W.'s adjudication was relevant because it was close in time to the minor's birth and that it was *prima facie* evidence of abuse and neglect of the minor. The trial court noted that respondent, while pregnant, consumed alcohol, attacked a teenager at the park, and failed to cooperate with police resulting in a raid to take protective custody of the minor's older sibling. The minor's birth occurred just two months beyond the last event. The trial court concluded that the findings in T.W.'s adjudication were sufficient to prove by a preponderance of the evidence that the minor was also abused and neglected, and thus incorporated those findings in the present case. The trial court also noted additional evidence that supported its determination. Respondent appeared at one hospital on July 29, 2024, and despite her doctor recommending that it was in the best interest of the minor that she be induced, respondent refused and stated she wanted a second opinion. Respondent then went to a different hospital a few days later, where she had not received any prenatal care, to deliver the minor. She had called ahead to find out whether DCFS would need to be notified, alleging that she had arranged for her own guardian for the minor. Respondent also lied about why she was under DCFS investigation. The trial court found that respondent was clearly trying to evade DCFS and failed to acknowledge her own actions that led to the DCFS investigation. The trial court concluded that the minor was subject to an injurious environment and a substantial risk of injury.

¶ 17                    B. Subsequent Reports and Information

¶ 18    A report submitted by the court appointed special advocate (CASA), dated October 30, 2024, noted that the minor was placed in traditional foster care due to concerns of substance abuse *in utero* and the existing case involving his older sibling. The minor's needs were met in his foster home. The minor was fussy and cried excessively about an hour after eating. His foster mother was working with a pediatrician and trying different formulas to determine if there was a possible

food allergy or sensitivity. The minor occasionally became rigid, had tremors on his right leg and mouth, and became very hot, sweaty, and red. The pediatrician stated that it was possibly due to drug or alcohol withdrawal. There was a strong attachment between the minor and his foster mother. During visitation, respondent held the minor and engaged with him through smiles and eye contact.

¶ 19    A Youth Services Bureau (YSB) report dated October 22, 2024, indicated that respondent was living at a motel in Elmhurst. A random drug screen, conducted on October 17, 2024, was positive for amphetamine. While such a test is positive at a level of 250 ng/ml, respondent's test result was greater than 2500 ng/ml. Respondent failed to provide a prescription to explain this result. Respondent was referred to counseling based on her history of domestic violence, verbal arguments with the minor's father, and family dynamic as the minor's natural father was also respondent's stepfather. Respondent completed intake forms and had commenced individual counseling. Additionally, respondent had completed 4 out of 12 recommended parenting sessions. The minor was placed in traditional foster care and was developing well. The minor occasionally experienced problems with leg tremors, body rigidity, fussiness, excessive crying, and an inability to get comfortable. The agency was helping foster mother obtain medical care for the minor. Withdrawal had not been ruled out as a possible cause for the conditions. However, foster mother continued to work with medical professionals to determine if there was another explanation, such as some type of allergy. Respondent was engaged during supervised visits with the minor, which she attended three times per week.

¶ 20    A DCFS integrated assessment dated October 22, 2024, stated that the minor was born on August 2, 2024, and protective custody was taken the next day due to T.W.'s active case. Respondent was combative at the hospital when the minor was born and, after her discharge, she

called the hospital multiple times demanding to know where the minor was placed. In an interview on October 16, 2024, respondent stated that she had been unemployed since January 2024, but that she was looking for a job. She also stated that she was still in a relationship and living with the minor's father. The assessment indicated that respondent consistently attended visits with T.W. and the minor. She also attended weekly therapy sessions and parenting classes. Respondent demonstrated limited means to take care of herself as she had unstable housing and was unemployed. DCFS recommended that respondent continue to participate in individual psychotherapy and parenting education classes. The goal of services was to address respondent's emotional instability and childhood traumas that had resulted in her poor insight and lack of ability to accept responsibility for her actions.

¶ 21    The integrated assessment further indicated that the minor was in traditional foster care and had shown withdrawal type symptoms such as leg tremors, body rigidity, and excessive sweating. Respondent and foster mother were able to calm him when he was fussy. Some of his symptoms were starting to lessen but reemerged after his most recent visit with his maternal grandmother, after which he cried and whimpered on and off for three hours. DCFS recommended regular supervised visits between respondent and the minor, and between the minor and his older sibling.

¶ 22    A DCFS Service Plan dated August 9, 2024, required respondent to comply with all recommended services, which included a substance abuse assessment, random drug screens, a mental health assessment, and parenting classes.

¶ 23    A letter from DCFS, dated October 21, 2024, to the minor's natural father stated that, after an investigation, DCFS determined that the reports of suspected child abuse and neglect as to the minor were determined to be unfounded.

¶ 24                              C. Dispositional Hearing

¶ 25    On October 31, 2024, the trial court held a dispositional hearing.  The trial court ordered the State to file the relevant CASA, YSB, and DCFS reports.  There was no objection to the admission of the October 2024 letter from DCFS finding the allegations of abuse and neglect of the minor to be unfounded.

¶ 26    Respondent testified that she was currently living in Bensenville with her aunt, uncle, cousin, and her cousin's children.  T.W. had originally been placed in the care of the aunt and uncle, and her cousin was a DCFS-approved supervisor.  Her aunt and uncle were remodeling another house and planned to move to that house when the remodeling was complete.  She planned to live in the Bensenville home with her cousin permanently.  Respondent was unemployed and able to care for the minor.  She had visitation with him three days per week.  Respondent's cousin had two children, ages 11 and 5.  The Bensenville home had seven bedrooms and she had been living there since October 29, 2024.  Prior to that, she lived in a motel in Elmhurst for about three or four weeks with the minor's father.  However, she was no longer in a relationship with him. She lived at the motel because it was closer to where she had visitation with T.W.

¶ 27    The State argued that the minor should be made a ward of the court because respondent was, at that time, unfit and unable.  The State acknowledged that respondent was participating in recommended services but noted that she had a positive drug screen for amphetamine on October 17, 2024.  The State argued that respondent was still in need of services including therapy and parenting classes, and that she should complete an updated substance abuse assessment based on the recent positive drug screen.  The State acknowledged DCFS's finding that the report of abuse and neglect was unfounded.  The State disagreed with that determination in light of the history of the case, T.W.'s adjudication, and the substance abuse that occurred while respondent was pregnant with the minor. The State requested a finding that the service plan was appropriate, that

the minor be made a ward of the court with custody and guardianship to remain with DCFS.

¶ 28     Respondent's counsel argued that the State failed to prove that the minor was neglected or abused.  Further, even if the trial court made such a determination, the minor did not need to be made a ward of the court.  Respondent was able to care for the minor and was living in a residence that had been vetted by DCFS as the original placement for T.W.  Respondent's cousin, who also lived at that residence, was approved as a third-party supervisor and thus passed background checks.  Counsel argued that there were no safety concerns to prohibit return home of the minor and that it was in the minor's best interest to be with his mother rather than in foster care.

¶ 29     The GAL stated that, in light of the October 2024 DCFS finding that the reports of abuse and neglect regarding the minor were unfounded, it was not appropriate or in the minor's best interest to remain in foster care.  The GAL acknowledged the recent positive drug test, but noted that respondent was willfully engaging in services.  The GAL opined that this should be an intact case because the facts did not support a finding that respondent was unfit or unable.

¶ 30     In response, the State argued that this should not be an intact case in light of respondent's recent positive drug screen—noting that that was one of the main reasons for the original DCFS involvement.  The State argued that the trial court was not bound by the DCFS finding.  The State further argued that respondent's housing situation was still new and unstable.  Further, there were only supervised visits and the State argued that there should be a transition from supervised, to unsupervised, and then ultimately to return home.

¶ 31     On November 4, 2024, the trial court ordered that the minor be made a ward of the court and found that respondent was unfit and in need of services.  The trial court noted that it reviewed the CASA report, the YSB report, the DCFS integrated assessment, and the DCFS service plan.  It also considered the October 2024 DCFS letter stating that the minor's case was unfounded and

respondent's positive test for amphetamines in October 2024. The trial court noted that respondent's home address was in flux as her criminal matters reflected an Elmhurst address, medical records indicated a Bensenville address, and respondent's testimony at the dispositional hearing recited a different Bensenville address. The trial court acknowledged the testimony that respondent and the minor's father were no longer together and that respondent was making progress on her service plans. The trial court also acknowledged the request for intact services. The trial court stated that its decision was based on consideration of the history of the case starting in April 2024 and through the minor's birth. The trial court found that, at the time of the minor's birth, respondent was trying to evade DCFS and lied to hospital staff as to why DCFS was involved. The trial court stated that DCFS's determination that allegations of abuse and neglect were unfounded did not change its determination that the minor was subject to an injurious environment and a substantial risk of injury. The trial court found that the service plans to date, and the goal of return home, were appropriate. The trial court requested that a new service plan be developed in light of the most recent positive test for amphetamines, which required a new substance abuse assessment, and respondent's new living situation. Thereafter, respondent filed a timely notice of appeal.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, respondent argues that the trial court erred in finding that the minor was neglected and abused, ordering that the minor be made a ward of the court, and granting custody and guardianship of the minor to DCFS.

¶ 34    The Act provides a two-step process for an adjudication of wardship. 705 ILCS 405/1-1 *et seq.* (West 2022); *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing at which the trial court considers only whether the minor is abused, neglected, or dependent. 705

ILCS 405/2-18(1) (West 2022); *A.P.*, 2012 IL 113875, ¶ 19. At the adjudicatory hearing, the focus is centered on whether the child is neglected, abused, or dependent, not on whether the parent caused that condition. *In re Arthur H.*, 212 Ill. 2d 441, 463-67 (2004). It is the State's burden to prove, by a preponderance of the evidence, that the allegations regarding the child's condition are more probably true than not. *Id.* at 463-64.

¶ 35   If the trial court determines that the minor is abused, neglected, or dependent, then the matter proceeds to a dispositional hearing at which it determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2022); *A.P.*, 2012 IL 113875, ¶ 21. Cases involving allegations of abuse and neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *Arthur H.*, 212 Ill. 2d at 463.

¶ 36                              A. Adjudication

¶ 37   Respondent's first contention on appeal is that the trial court erred in finding that the minor was neglected and abused. A neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2022); *A.P.*, 2012 IL 113875, ¶ 22. Neglect is defined as "the failure to exercise the care that circumstances justly demand" and encompasses both willful and unintentional disregard of parental duty. *A.P.*, 2012 IL 113875, ¶ 22. "It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." *Id.* Similarly, the term "injurious environment" has been recognized as an "amorphous concept that cannot be defined with particularity," but includes the "breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *Id.*

¶ 38    An abused minor under section 2-3(2)(ii) of the Act includes one whose parent or other person responsible for his welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2022). Actual injury is not required, it is sufficient if there is substantial risk of physical injury. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35. The same allegations supporting the finding of neglect due to injurious environment can also support the finding of abuse due to substantial risk of physical injury. *Id.* ¶ 57.

¶ 39    A trial court's finding of neglect or abuse will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Z.L.*, 2021 IL 126931, ¶ 61. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 49. A reviewing court defers to the trial court's findings of fact because it is in the best position to observe the testimony of the witnesses, assess their credibility, and weigh the relative evidence. *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006).

¶ 40                                    1. Standard of Review

¶ 41    At the outset, respondent argues that we should review *de novo* the trial court's adjudication decision because the trial court relied only on documentary evidence and judicial notice of previous cases and proceedings. In so arguing, respondent relies on *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 28. In that case, the State filed petitions for adjudication of four siblings based on an incident where one sibling found a loaded weapon in the home and accidentally shot another sibling in the head. *Id.* ¶ 1. Two months later, when Zion was born, the State filed a petition for adjudication of him as well, and a hearing on all the petitions proceeded simultaneously by

stipulation. *Id.* The trial court found that Zion's siblings were neglected and abused but that the State failed to prove Zion was neglected or abused under a theory of anticipatory neglect. *Id.* The public guardian appealed that decision and there was disagreement as to the appropriate standard of review. *Id.* ¶ 26. The reviewing court acknowledged that, "[o]rdinarily, a trial court's ruling regarding neglect or abuse will not be disturbed unless it is against the manifest weight of the evidence." *Id.* ¶ 27. Nonetheless, the reviewing court held:

> "In this case, however, the trial court's finding that Zion was not neglected was based upon a stipulated record and not based upon any observations of the witnesses or witnesses' testimony. As such, the trial court was not in a better position than the reviewing court to assess credibility or weigh the evidence. Therefore, since we are in the same position as the trial court, the trial court is not vested with wide discretion, and our review is *de novo*." *Id.* ¶ 28.

¶ 42 We find *Zion M.* factually distinguishable and decline respondent's request to apply a *de novo* standard of review. In the present case, unlike *Zion M.*, the trial court's findings were not based solely on stipulated documentary evidence. Rather, the trial court presided over T.W.'s adjudication and observed live testimony, made credibility determinations, and resolved inconsistencies in the evidence. See *T.W.*, 2025 IL App (2d) 240573-U, ¶¶ 6-20. T.W.'s adjudication was relevant to a proper determination regarding the minor's adjudication, especially since some of the matters at issue in T.W.'s adjudication occurred while respondent was pregnant with the minor. Under these circumstances, the proper standard of review is whether the trial court's decision was against the manifest weight of the evidence.

¶ 43                                     2. Abuse and Neglect

¶ 44    Turning to the merits, the trial court's determination that the minor was neglected and abused was not against the manifest weight of the evidence.  The same evidence that supports the trial court's finding of neglect due to an injurious environment also supports its finding of abuse based on a substantial risk of physical injury.  The trial court determined that the minor was abused and neglected, in part, based on a theory of anticipatory neglect—noting that T.W.'s adjudication was close in time to the minor's birth and that it was *prima facie* evidence that the minor was abused and neglected.  As stated by this court:

> "Sibling abuse may be *prima facie* evidence of neglect based on an injurious environment.  [Citation.]  However, this presumption is not permanent; it weakens over time and can be rebutted by the introduction of other evidence.  [Citation.]  Nevertheless, '[w]hen faced with evidence of prior abuse by parents, the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury.'  [Citation].
>
> There is no *per se* rule of anticipatory neglect in Illinois, and each case concerning the adjudication of minors must be reviewed according to its own facts.  [Citation.]  To determine whether a finding of anticipatory neglect is appropriate, the trial court should consider the current care and condition of the child in question and not merely the circumstances that existed at the time of the incident involving the child's sibling.  [Citation.]" *In re S.S.*, 313 Ill. App. 3d 121, 127-28 (2000).

¶ 45    We start by noting that respondent challenges the finding of anticipatory neglect by challenging the events that led to T.W.'s adjudication, essentially relying on the same arguments and caselaw she previously cited on appeal in arguing that T.W.'s adjudication was erroneous.  See *In re T.W.*, 2025 IL App (2d) 240573-U, ¶¶ 46-52.  We continue to find those arguments and case law unpersuasive.  In this case, the minor was born just two months after the State filed its petition

for adjudication as to T.W. and, thus, we agree with the trial court that the timing of T.W.'s adjudication makes it relevant to a determination with respect to the minor. Moreover, much of the evidence that was relevant to T.W.'s adjudication happened while respondent was pregnant with the minor such that the minor, *in utero*, was placed in an injurious environment. Specifically, the record shows that, in April 2024, while six months pregnant with the minor and having had no prenatal care, respondent went to the hospital with a blood alcohol content of .293 and then, against medical advice, left the hospital. A subsequent medical report indicated that respondent stated that her last drink was April 23, 2024, thus showing she continued to drink after the April 20 incident. Further, on April 23, 2024, respondent started a physical altercation with a teenager at a park. The teenager sustained injuries and three people needed to pull respondent off of her. Thereafter, when respondent learned that DCFS wanted to take protective custody of T.W., she fled with her. This led to the police forcefully entering her home at 1 a.m. with guns drawn and having to drag respondent and T.W. out of a closet. In all these instances, the minor, *in utero*, was placed in an injurious environment and was at substantial risk of physical injury. The finding of anticipatory neglect was not against the manifest weight of the evidence.

¶ 46 Moreover, as noted by the trial court, there was additional evidence that supported a determination of abuse and neglect. Despite prohibitions on drug use, respondent tested positive for amphetamine in October 2024. Further, the record shows that, on July 29, 2024, respondent went to an office visit at one hospital and asked questions to determine whether DCFS would have to be notified when the minor was born. She was advised at that time that her labor should be induced and that failure to do so increased the risk of stillbirth. However, against that advice, she left the hospital. A couple days later, she arrived at a different hospital, where she had not received any prenatal care, and lied about why DCFS was involved in the minor's case. This evidence

showed that, as with T.W., respondent was once again trying to evade DCFS. The foregoing evidence of respondent's actions with the minor *in utero,* and at the approach of his birth—putting him at risk in attempts to evade DCFS, demonstrate that respondent subjected the minor to an injurious environment, breached her "duty to ensure a safe and nurturing shelter" for the minor (*Arthur H.*, 212 Ill. 2d at 463), and created a substantial risk of physical injury.

¶ 47 Respondent notes that the trial court took judicial notice of the 2023 order of protection she filed against her mother and her criminal cases involving aggravated battery and child abduction. Respondent argues that her domestic abuse allegations against her mother should not factor into the adjudicatory decision as a matter of public policy, as it is improper to use her attempt to protect her child, by seeking an order of protection, against her in the present proceedings. Respondent also argues that the criminal cases were still pending and she was entitled to a presumption of innocence. In her reply brief, respondent clarifies that she is not alleging that the trial court erred in taking judicial notice of these related cases, just that it was improper to the extent the trial court considered them in support of its finding of neglect or abuse.

¶ 48 These arguments are unpersuasive. Although the trial court stated it took judicial notice of the subject cases, its decision did not place any improper emphasis on the cases themselves. Other than taking judicial notice, the trial court did not mention the order of protection in its ruling. The trial court did mention the incident at the park and fleeing with T.W., but that was not based only on judicial notice of criminal proceedings, it was based on the testimony and evidence at T.W.'s adjudication hearing regarding those events. There is no indication in the record that the trial court's adjudicatory decision was based on an assumption as to the ultimate resolution in the criminal cases. The trial court also noted that respondent provided an address to the hospital that was different from the address in her court file, and that her conditions of pretrial release required

her to give notice of any change of address within 24 hours. However, this was only mentioned as further evidence of respondent's attempt to evade DCFS when the minor was born.

¶ 49 Respondent also argues that the trial court's finding that she was attempting to evade DCFS at the time of the minor's birth was against the manifest weight of the evidence. She notes that a friend was the one asking about DCFS and HIPPA, and that she ultimately went to the second hospital even though she knew that DCFS would be contacted. While we commend respondent for going to the hospital to deliver rather than attempt a home birth, her actions nonetheless placed the minor at risk. When her treatment provider that she had seen for months recommended that labor be induced to minimize the risk of stillbirth, respondent declined so that she could seek a second opinion. The next day, she called a second hospital asking about whether DCFS would need to be notified. She then went to that hospital, where she had received no prenatal care, to deliver the minor. The medical records indicated that her only reason for coming to the second hospital was that she did not like her doctor at the first hospital. A trial court is allowed to draw reasonable inferences from the evidence (*In re D.F.*, 201 Ill. 2d 476, 499 (2002)) and we accept those inferences that support the trial court's order (*In re Marriage of Gambla*, 367 Ill. App. 3d 441, 463 (2006)). Based on this evidence, it was not unreasonable for the trial court to find that respondent was attempting to evade DCFS at the minor's birth, especially in light of her flight with T.W. and her history of being untruthful. See *T.W.*, 2025 IL App (2d) 240573-U, ¶¶ 9, 14.

¶ 50 The cases cited by respondent are factually distinguishable and do not support a reversal of the trial court's determination. See *Zion M.*, 2015 IL App (1st) 151119, ¶ 34 (no anticipatory neglect where mother was not the person responsible for the previous neglect and the father no longer lived in the home); *In re D.R.*, 354 Ill. App. 3d 468, 475 (2004) (anticipatory neglect finding reversed where the State failed to present any evidence concerning the current care and condition

of the younger sibling); *In re J.P.*, 331 Ill. App. 3d 220, 235 (2002) (finding of anticipatory neglect affirmed where the record showed the trial court's determination was based on the current care and condition of the sibling and not solely based on the past finding of neglect as to the older sibling); *In re Edricka C.*, 276 Ill. App. 3d 18, 20-21 (1995) (neglect finding reversed as it was based on conduct involving older siblings over two years prior; mother had made significant progress in services; and mother had unsupervised visits five of her six other children). In the present case, unlike the cases relied on, respondent's own actions were responsible for the previous finding of neglect, the incidents at issue took place while she was pregnant and placed the minor at substantial risk of injury *in utero* and at birth, and respondent had just recently started services and still had only supervised visitation with the minor's older sibling.

¶ 51                                    B. Disposition

¶ 52    Respondent next argues that the trial court's determinations as to wardship and custody were against the manifest weight of the evidence. In any proceeding initiated pursuant to the Act, the paramount consideration is the best interest of the child. *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). Section 2-22(1) of the Act, which governs dispositional hearings, states as follows:

"At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if [so] *** , the court shall determine the proper disposition best serving the health, safety[,] and interests of the minor and the public. The court also shall consider the permanency goal set for the minor, the nature of the service plan for the minor[,] and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." 705 ILCS 405/2-

22(1) (West 2022).

A trial court may not enter a dispositional order with respect to a neglected or abused child unless the child is first made a ward of the court. *Id.* § 2-23(1)(a). By making a child a ward of the court, a trial court can, among other things, keep the case open, oversee the provision of services, and enter any protective orders necessary. *Id.* § 2-23(3).

¶ 53    Section 2-27 of the Act provides that, prior to committing the minor to the custody of a third party, such as DCFS, a trial court must first determine whether the parent is unfit, unable, or unwilling to care for the minor and whether the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian, or custodian. *Id.* § 2-27(1); *In re M.M.*, 2016 IL 119932, ¶ 21. At the dispositional stage, the State bears the burden of proving that a parent is unfit, unable, or unwilling to care for the minor by a preponderance of the evidence. *In re K.E.S.*, 2018 IL App (2d) 170907, ¶ 51. On review, we will not overturn the trial court's dispositional determination unless its factual findings are against the manifest weight of the evidence or it commits an abuse of discretion by selecting an inappropriate disposition. *Id.* As noted earlier, a finding is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence. *Juan M.*, 2012 IL App (1st) 113096, ¶ 49. A trial court abuses its discretion where no reasonable person would take the view adopted by the trial court. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005).

¶ 54                                    1. Wardship

¶ 55    Respondent argues that the trial court erred in making the minor a ward of the court because she had made progress since the events that triggered the DCFS involvement with T.W. Respondent notes that, since April 2024, she attended regular prenatal appointments, she no longer

lived with her mother or the minor's father—the sources of the domestic violence, she found a suitable home with her aunt and cousin, she was engaged in therapy, and was appropriate during her visits with the minor.

¶ 56    Despite these arguments, we cannot say that the trial court's decision to make the minor a ward of the court was against the manifest weight of the evidence. Respondent had just recently started services and was still having only supervised visits with T.W. and the minor. Further, she recently tested positive for amphetamine when one of her service requirements was to abstain from substance abuse. Other than her own self-serving statements, there is nothing in the record to support her assertion that the positive test was due to the use of Sudafed for a cold. While respondent states that she had stable housing, at the time of the dispositional hearing, she had only been living there for two days. While she argues that she had separated from the minor's father, she was living with him at a motel up until two days before the dispositional hearing. Merely because respondent was appropriate during her supervised visits and was making progress on services is not sufficient for us to find that the trial court's decision was arbitrary or unreasonable.

¶ 57                                    2. Fitness

¶ 58    Finally, respondent argues that the trial court's determination, that the minor should not be returned home, was against the manifest weight of the evidence. We disagree. The record shows that respondent had anger issues, made poor decisions, and placed her children at risk. This was shown in the events leading up to T.W.'s adjudication, her actions close to the minor's birth, when she ignored medical advice to induce labor so that she could explore the possibility of evading DCFS, and when she became combative with hospital staff after the minor was born. The record also indicates that respondent drank while she was pregnant and that the minor exhibited withdrawal symptoms such as leg tremors, body rigidity, fussiness and excessive sweating. While

respondent had started participating in services, there was no indication that she had resolved the issues that required DCFS to become involved. She had only completed 4 of 12 required parenting classes and she tested positive for amphetamines in October 2024. While respondent argues that she could provide the minor with a supportive and stable environment, she had moved into a house with her aunt and cousin just two days before the dispositional hearing. Despite the fact that she contributed to the current situation by not cooperating with DCFS and fleeing with T.W., the evidence showed that respondent attempted to evade DCFS and lied to hospital staff about her DCFS involvement at the time of the minor's birth. Accordingly, we cannot say that the trial court's determination, finding that respondent was unfit and in need of further services, was against the manifest weight of the evidence.

¶ 59    In so ruling, we acknowledge that the GAL opined that, in light of the DCFS finding that the reports of abuse and neglect of the minor were unfounded, the minor should be returned to respondent. However, a DCFS determination that allegations of abuse and neglect were unfounded is not a conclusive determination that there was no abuse or neglect. See 89 Ill. Adm. Code 300.110(i)(3)(B) (1998) (a DCFS finding of "unfounded" is merely a decision that there is not enough evidence to conclude that child abuse or neglect occurred). Moreover, it goes without saying that the trial court is not bound by the decisions of DCFS, nor is the trial court bound by the recommendations of a GAL (*Taylor v. Starkey*, 20 Ill. App. 3d 630, 634 (1974)).

¶ 60    In arguing that she was fit, respondent cites evidence that she had been appropriate during visits with the minor. However, merely because respondent was appropriate during supervised visitation does not necessarily mean she could be appropriate if the minor was in her unsupervised care full-time. Respondent also argues that there was no connection between the recommended services or a showing that such services were needed. We disagree. The evidence presented

supported the conclusion that, based on respondent's past conduct, she was in need of a substance abuse assessment, parenting classes, and psychotherapy. Respondent argues that she was found unfit because she failed to complete her services and that this was a violation of due process because no one could complete services between an adjudication hearing and a dispositional hearing. This argument is also without merit because it was not her failure to complete services that resulted in the contested disposition. Rather, it was her conduct that led to the DCFS involvement, which showed that services were necessary to deem her fit to care for her children. The safety and best interest of the minor was the court's primary consideration and, based on the totality of circumstances, we hold that the trial court's decision was amply supported by the evidence.

¶ 61     Respondent relies extensively on *K.E.S.*, 2018 IL App (2d) 170907, in arguing that she was fit to care for the minor. *K.E.S.* is factually distinguishable. In that case, the dispositional hearing occurred some months after the minor was taken into DCFS custody and, during those months, the mother had complied with all her recommended service plans and had corrected the conditions that caused the minor to be removed from her care. *Id.* ¶ 64. Further, the mother's mental health was at issue in that case and the evidence showed that the mother had sought out therapy and medication and had made good progress. Further, DCFS and CASA had allowed unsupervised visitation and the mother's therapist opined that she had no concerns about the mother caring for the minor as long as mother continued with her therapy and medication. *Id.* ¶ 65. The facts in *K.E.S.* are not on par with those in the present case. Here, unlike *K.E.S.*, respondent had just started her service plans and she was not yet allowed unsupervised visitation. There was no evidence of significant progress in the recommended services or that respondent corrected the conditions that

led to the minor's removal. Accordingly, *K.E.S.* does not warrant a different outcome in the present case.

¶ 62    As in *T.W.*, we acknowledge that the facts in this case are not among the most severe that our courts have encountered, and the record shows that respondent is thus far cooperating with her recommended services. However, upon review, we cannot conclude that the trial court should have reached the opposite result. *Juan M.*, 2012 IL App (1st) 113096, ¶ 49.

¶ 63                                   III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 65    Affirmed.